**IN THE COURT OF APPEALS OF IOWA**
No. 19-1984
Filed April 15, 2020

**IN THE INTEREST OF L.T. and L.T.,**
**Minor Children,**

**T.B., Mother,**
     Appellant.

_____

Appeal from the Iowa District Court for Dallas County, Virginia Cobb, District Associate Judge.

A mother appeals the termination of her parental rights to two children. **AFFIRMED.**

Bryan J. Tingle, Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Kayla Stratton of Juvenile Public Defender, Des Moines, attorney and guardian ad litem for minor children.

Considered by May, P.J., Schumacher, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**MAHAN, Senior Judge.**

A mother appeals the termination of her parental rights to two children, born in 2013 and 2016.[1] She contends (1) the State failed to prove the grounds for termination cited by the juvenile court; (2) termination was not in the children's best interests; and (3) the children's placement with the father should have precluded termination of her parental rights. We affirm.

**I.    Background Facts and Proceedings**

This family most recently came to the attention of the department of human services in January 2018, upon reports of physical abuse of the children by the mother. The mother was intoxicated and caring for L.T., L.T., and J.T.[2] while the father was at work when she started to "go crazy" and yell at the children. The mother shoved, kicked, and punched J.T., and she held J.T. down in bath water by his neck. J.T. had bruises and marks from the incident. There were unexplained marks on L.T. and L.T. as well. The father came home from work, called the police, and the mother was arrested. A child abuse assessment resulted in founded reports for physical abuse and failure to provide proper supervision. A no-contact order was entered prohibiting the mother from having contact with the children. A no-contact order that had already been in place for J.T. was extended.

---

[1] The parental rights of children's father were not terminated. The children were placed in a guardianship with the father. The parents were previously married. They are now divorced but continue to be in a relationship.

[2] The mother was involved with the department beginning in 2009, due to mental-health concerns, violence toward the father, and adoption scams ("pretending to be pregnant to prospective adoptive parents"). In 2012, the mother's parental rights were terminated to J.T., born in 2008, while she was in prison on charges for filing a false report and perjury.

The mother reported she had been diagnosed with bipolar disorder, borderline personality disorder, obsessive-compulsive disorder, and post-traumatic stress disorder. The mother stated that she discontinues her mental-health medication when she feels it is unnecessary, and that she self-medicates with alcohol when she goes off her medication. The mother admitted to "binge drinking" when "things are wrong." The father acknowledged the mother was not taking her medication and had been "getting unstable."

The children were adjudicated in need of assistance. The no-contact order with regard to L.T. and L.T. was subsequently modified to allow the mother to have supervised contact with them at the department's discretion. The mother began supervised visits with L.T. and L.T. in May when she was released on pretrial supervision. In July, the mother pled guilty to a charge of child endangerment stemming from the incident in January. Within a few months, in August 2018, the mother attempted suicide by overdosing on her medication, and she was hospitalized for several weeks. Upon her release from the hospital, the mother turned herself in on an outstanding warrant.[3] Since then, the mother has had daily phone contact with L.T. and L.T.

The State filed a petition to terminate the mother's parental rights in December 2018. The termination hearing took place over two days in April and May 2019. The mother was incarcerated at the Iowa Correctional Institute for Women in Mitchellville, with a possible release date in July or August 2019. The

---

[3] The mother was charged with operating while intoxicated and two counts of false reporting. Upon her arrest, she was admitted to the hospital due to her high level of intoxication.

mother testified her plan was to "parole to the House of Mercy," where "they have a bed ready." The mother had recently been cleared for in-person visits with the children at the prison, but no visits had taken place yet.[4] She received medication management and felt her new medication was "working amazing." She was engaging in individual therapy and had participated in several therapeutic programs in prison, which "teach[] you how to deal with your emotions, you know, your impulses" and "teach[] you to think before you act, what are your values." She also took an alcohol-related class. The mother received work-related training, was certified to operate a forklift, and was to receive assistance in finding employment upon her release from prison.

The mother requested additional time for reunification. She believed the children could spend time with her at House of Mercy "[t]hree months down the line, a couple months" after she established herself there. The mother acknowledged she "can't go home right now" but stated she and the father had been together "for 18 years" and she believed the no-contact order on J.T. could be modified to allow her to live in the family home again. The father testified that he would allow the mother to see the children "if I think she is safe," but he questioned her ability "to stay sober." The department and guardian ad litem recommended termination of the mother's parental rights.

---

[4] The department caseworker testified she had submitted the visitation form to family safety, risk, and permanency services and had asked the father to make an appointment for the older L.T. to see a victim-advocacy therapist, which were prerequisites to establishing visitation at the prison due to the mother's child-endangerment charge and the no-contact order in place between the mother and the children.

Following the termination hearing, the court entered its order terminating the mother's parental rights pursuant to Iowa Code section 232.116(1)(d), (f), (g), and (h) (2018). The mother appeals.

## II. *Standard of Review*

Appellate review of termination-of-parental-rights proceedings is de novo. *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019). Our primary consideration is the best interests of the children, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the children's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

## III. *Discussion*

The mother challenges the sufficiency of the evidence supporting the grounds for termination cited by the juvenile court. We may affirm if we find clear and convincing evidence to support any of the statutory provisions. *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We will focus on Iowa Code section 232.116(1)(d), which requires the State to show:

> (1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents . . . .
> (2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

With regard to this subsection, the mother contends, "Contrary to the Court's findings [she] was in fact taking advantage of the services offered to her, although limited, to correct the circumstances which led to the adjudication and as such the State failed to prove this element 2." Her argument focuses on her claim

that she "took advantage of every service available" to her but the services were inadequate to allow her to demonstrate her parenting skills and "continue working on her areas of need."

In order to determine what circumstances led to the adjudication and required correction, we look to the adjudication order. The juvenile court made findings of fact, including:

> 2. There is clear and convincing evidence to support the allegations of the petition(s) filed January 25, 2018 and the children are adjudicated in need of assistance pursuant to Iowa Code section(s) 232.2(6)(b) and (6)(c)(2) and the aid of the Court is required.
> 3. The Court makes the following specific findings of fact: there is a founded [child protective services assessment] against the mother for physical abuse and denial of critical care regarding the children; counsel for mother takes no position as the children's mother has decided not attend/be transported; mother remains in custody due to the criminal charges.

We have examined the child protective services assessment identified in the findings of fact. The report was founded as to both children for physical abuse and failure to provide proper supervision.[5] The report stated:

> [The mother] has mental health issues that are not adequately being addressed. She is using alcohol in place of medication. She was under the influence of alcohol as a sole caretaker and became physically aggressive with the children. All three child[ren] sustained injuries from [the mother]. [The mother] denied being able to recall what transpired with her children and how they sustained injuries.

Following this incident, the mother was arrested and jailed on charges of child endangerment. As the mother acknowledges, she spent these proceedings in and out of jail and she was incarcerated at the time of the termination hearing. However, contrary to the mother's assertion, she was offered many services to

---

[5] The report was also founded on these bases as to J.T.

correct the circumstances which led to the children's adjudication, including, but not limited to, a psychological evaluation, therapy, mental-health treatment, medication management, an alcohol-related class, and supervised visitation.

Despite those services, the circumstances which led to adjudication continued to exist at the time of termination. *See* Iowa Code § 232.116(1)(d)(2). The mother's therapist opined that, given her considerable mental-health needs, the mother should be closely monitored for an extended time prior to any possible reunification due to safety concerns for the children. The department caseworker opined that during the time since removal, the mother "has had minimal time of stability to where she showed that she was able to parent her children and to maintain a stable lifestyle," and "[i]t is not fair for these children to continue to have to wait for their mother to get herself into a position where she would be able to parent them on a consistent basis." We agree. *Cf. In re T.C.*, No. 13-1023, 2013 WL 4774049, at *4 (Iowa Ct. App. Sept. 5, 2013) ("T.C. was adjudicated [child in need of assistance] due to drug abuse and violence by his parents. The father has made no progress to correct this situation. Termination under Iowa Code section 232.116(1)(d) is supported by clear and convincing evidence.").

The juvenile court further observed, "The mother fails to understand the connection between her behaviors, her history, and her mental health. It is clear that, even with the appropriate, intensive therapy, she would not be safe to parent her children in six months." *Cf. In re T.C.*, 489 N.W.2d 53, 55–56 (Iowa Ct. App. 1992) (noting a parent's failure to admit and address her psychological and substance-abuse problems constitutes a failure to cooperate in correcting the

circumstances that led to the adjudication). We concur in the court's finding that Iowa Code section 232.116(1)(d) was satisfied.

We turn to the children's best interests. The mother contends termination of her parental rights is not in the best interests of the children because "[t]he children obviously know who [she] is, she apparently will be allowed to remain a part of the children's lives by the father and by legally terminating her parental rights, this will only serve to confuse and possibly continually traumatize the children as they grow up." Indeed, the father testified he would allow the mother to be around the children "if she is safe and sober," but he also stated "[i]t depends on her mental state" and he "wouldn't break any no-contact orders." The parents have a lengthy history, and the juvenile court was aware the father had allowed the mother to be around J.T., to whom her parental rights had been terminated. When asked if the court should decline to terminate the mother's parental rights and allow the department to stay involved with the family, the department caseworker responded:

> No. . . . Because there's a no-contact order. So DHS is not going to stay involved for the next four to five years to be able to monitor whether or not [the mother] and [the father]—if they're able to do this. I think that at some point in time these children deserve to have normal lives without DHS coming to see them, without [family safety, risk, and permanency workers] coming to see them. They have a right to be able to be kids, and at some point in time [the father] is going to have to be able to protect them. And so, you know, if we were to terminate and she were to be allowed to come back into the house by [the father], it would then be on [the father]. And I think that having that responsibility, [the father] would be more likely to be a little more protective instead of knowing that if she were to come in, if this were to happen again, [the mother] would leave the home and we would go through all of this again.

The mother also contends termination of her parental rights will position the father as the children's "sole provider" and "effectively cut off an avenue of financial support for the children as [she] is entitled to federal Social Security benefits due to disabilities." But the mother testified that she believed "getting disability . . . led to my depression, which led to my drinking, which led to my downfall . . . because I didn't have a life outside of my house." The mother expressed her desire "to get out there and work." We commend the mother's goals and progress to being self-sufficient, and we cannot conclude financial interests preclude termination of parental rights. Stability and permanency are in the children's best interests. Having given "primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]," Iowa Code § 232.116(2), we conclude termination is in the children's best interests.

The mother also argues that the court should have applied an exception to prevent termination because "the father maintained care and custody of the children throughout the proceedings." *See id.* § 232.116(3)(a) (providing that the juvenile court need not terminate parental rights if "[a] relative has legal custody of the child[ren]"). The exceptions to termination of parental rights found under section 232.116(3) are permissive, not mandatory. *In re A.S.*, 906 N.W.2d 467, 45 (Iowa 2018). "An appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child[ren]." *In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997). The court considered the fact that the children were placed in the sole custody of the father but found it did not preclude termination "given the older children's continued fears, and [the

mother's] continued lack of control of her behavior." We concur in the court's finding. We conclude termination is in the children's best interests, and no permissive statutory exception should be applied to preclude termination. We affirm the decision of the juvenile court to terminate the mother's parental rights.

**AFFIRMED.**